[Crim. No. 29628. Second Dist., Div. Five. Dec. 9, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
MYRON ALLISON BULLARD, JR., Defendant and Appellant.

**COUNSEL**

Paul M. Davis for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Andrew D. Amerson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**STEPHENS, J.**—This appeal is taken from a judgment based upon a jury verdict convicting appellant of inflicting upon a child unjustifiable physical pain and mental suffering under circumstances likely to produce great bodily harm or death, in violation of Penal Code section 273a, subdivision (1), and assault by means of force likely to produce great bodily injury in violation of Penal Code section 245, subdivision (a), the latter conviction being dismissed since it was based upon the same circumstances.

Appellant raises three issues in this appeal: whether the trial court erred in admitting the hearsay declarations of Becky Bullard as declarations against interest; whether the trial court erred in permitting the prosecution to ask leading questions of Becky Bullard; and whether there was sufficient evidence to sustain the conviction.

Excluding the evidence in controversy, the record shows that on March 19, 1976, Becky Gutierrez, who subsequently became Becky Bullard, resided in the rear portion of a duplex apartment with her two children, Cindy, four years old, and Carrie, two and one-half years old, and with appellant. Mrs. Jeannie Martel resided in the front portion of the same duplex.

Mrs. Martel testified that she had seen Carrie at about 4 p.m. on March 19 and that Carrie had appeared to be a healthy child. Mrs. Powers, Carrie's grandmother, stated, however, that when she saw Carrie about 3 p.m. on the same day, she had noticed a fading bruise on Carrie's face, in the shape of a large handprint. Later that evening, at about 7 p.m., Mrs. Martel saw Becky Bullard sitting in a bedroom with her daughter Cindy. At about the same time Mrs. Martel heard repeated thumping sounds, as if something were hitting a wall, followed each time by Carrie crying. As far as Mrs. Martel knew, the appellant was the only other person in the apartment.

Mrs. Martel was not allowed to see Carrie until Sunday, March 21, at which time the child was in bed. She described Carrie's head as swollen to approximately two to three times its normal size "from the forehead up," and her eyes as black and blue and swollen shut. Mrs. Martel, a former nurse, offered to take Carrie to the hospital but was not allowed to.

The next day Carrie's eyes were just beginning to open when Mrs. Martel saw her. At that time Mrs. Martel noticed a small patch of hair, about the size of a quarter, missing from the right side of Carrie's head. The bruises, blackened eyes and missing hair were confirmed by Mr. Floyd Powers, Carrie's grandfather, who saw Carrie on March 25 and at that time offered to take her to the hospital.

At the beginning of April Carrie fell down some stairs, causing a lacerated chin which required stitches. Dr. Michael Siaw treated Carrie when appellant and Becky Bullard took her to Whittier Hospital. Neither Dr. Siaw nor the doctor who removed the stitches three days later made

any notation in the hospital emergency records regarding potential child abuse. However, Dr. Siaw testified that he did not remember the child nor the incident and that a physician will frequently make a diagnosis based upon what he or she is told by the person bringing the child in to be treated.

Dr. Arthur examined Carrie on April 6, 1976, at McLaren Hall. He concluded that the black and blue marks above and below each eye, on the right cheek, on the neck, on the back of the head, and on the left arm of Carrie were approximately two weeks old and had probably been inflicted by some individual. Only the laceration on the chin, in his opinion, could have been caused by either falling down three stairs or by falling out of bed, as the appellant might have us believe.

Additional evidence that the child may have been abused or that appellant had abused her was Mrs. Martel's testimony that she had on occasion heard Carrie scream because the appellant was on his way home from work. In contrast to this is Mrs. Martel's testimony that despite what she had heard and seen she would leave her own children for Becky Bullard to watch, albeit on the specific condition that they would not be touched.

Becky Bullard was called as a witness for the prosecution, but, except for the most preliminary questions, she refused to answer the questions put to her, upon the advice of counsel, on the grounds that the answers might tend to incriminate her. The trial court sustained most of her claims of privilege since she was being charged separately under Penal Code section 273a, subdivision (2). All of the questions asked and her refusal to answer occurred in front of the jury.

The court then heard, out of the jury's presence, proffered evidence of extrajudicial statements made by Becky Bullard to Mrs. Martel on the weekend of March 20 and 21 in order to determine whether or not such hearsay declarations were admissible as declarations against interest under Evidence Code section 1230.[1] In making such a

---

[1]Evidence Code section 1230 provides that "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

determination certain preliminary facts must be established to the satisfaction of the trial court. One preliminary fact is the unavailability of the witness; a witness who properly claims the privilege against self-incrimination, as is the case here, meets this prerequisite. (*People* v. *Chapman,* 50 Cal.App.3d 872, 878 [123 Cal.Rptr. 862].)

The focus, indeed, the heart, of this exception to the hearsay rule is the second preliminary fact—the basic trustworthiness of the declaration. The judge may consider all the surrounding circumstances in determining whether "a reasonable man in [declarant's] position would not have made the statement unless he believed it to be true." (Evid. Code § 1230; *People* v. *Chapman, supra.*) The lower court in this case did not make a specific finding of trustworthiness, but it can be presumed from the court's decision to admit some of the declarations and not others. Based upon the lower court's decision, the following questions were allowed to be asked of Mrs. Martel in the jury's presence, and she gave the indicated answers:

"Q. . . . did Mrs. Bullard tell you that the sound that you heard was the sound of Rocky's [appellant's] hand hitting the wall?

"A. Yes she did.

"Q. Did Mrs. Bullard state to you on that date that Rocky had slapped Carrie more than one time?

"A. Yes, she did.

"Q. And on that date did Mrs. Bullard refuse to let you see the child?

"A. Yes, she did.

"Q. Did she state to you that the reason why she refused to let you see the child was because she was afraid that she might get into trouble or that Rocky might get into trouble?

"A. Yes.

". . . . . . . . . . . . . . . . . .

"Q. And did Mrs. Bullard at that time state to you that it wasn't as bad as it seemed?

"A. Yes, she did.

"       .   .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. At that time did Mrs. Bullard tell you that—or refuse to let you take Carrie to the hospital because she was afraid again that she would get into trouble or that Rocky would get into trouble?

"A. Yes, she did."

At least a portion of these statements were made when Mrs. Bullard was confronted by Mrs. Martel about the thumping sounds and Carrie crying, and when Mrs. Martel had seen Carrie's bruises. This testimony is direct evidence linking appellant with the crime.

Were the statements an inseparable combination of exculpatory and inculpatory matter such as to bar their admission as an exception to the hearsay rule? (*People* v. *Shipe,* 49 Cal.App.3d 343, 354 [122 Cal.Rptr. 701].)[2]

---

[2]On appeal respondent suggests that even if the statements are not against penal interest, they are admissible because Mrs. Bullard was a coconspirator. This theory was not considered at trial and, had it been, there clearly would have existed error because jury instruction CALJIC No. 6.24, or its equivalent, was not given.

CALJIC No. 6.24 reads as follows:

"Any evidence of a statement made by one alleged conspirator other than at this trial shall not be considered by you as against another alleged conspirator unless you shall first determine from other independent evidence that at the time the statement was made a conspiracy to commit a crime existed and unless you shall further determine that the statement was made while the person making the statement was participating in the conspiracy and before or during the time the person against whom it was offered was participating in the conspiracy and, finally, that such statement was made in furtherance of the objective of the conspiracy.

"The word 'statement' as used in this instruction includes any oral or written verbal expression or the nonverbal conduct of a person intended by him as a substitute for oral or written verbal expression."

The "Use Note" in CALJIC No. 6.24 reads as follows:

"If this instruction is given, the court must sua sponte give an instruction defining conspiracy as it is defined in the crime of conspiracy including commission of an overt act. [Citation.]"

The "Comment" in CALJIC No. 6.24 reads in part as follows:

"Conspirator's statements admissible against coconspirator only when made during the conspiracy and in furtherance thereof. [Citation.]

"Before evidence of the acts and declarations of an alleged coconspirator is admissible against the other conspirators, prima facie evidence of the conspiracy must be proved. [Citation.]

"The continued existence of the conspiracy must be established, prima facie, independently of the hearsay evidence of declarations of coconspirators before such evidence is admitted for the truth of the matters asserted. [Citation.]"

*People* v. *Leach,* 15 Cal.3d 419, at page 438 [124 Cal.Rptr. 752, 541 P.2d 296], states that California recognizes that " . . . evidence of declarations against *penal* interest [is] an exception to the hearsay rule. [Citations.] Moreover, under California law the declarant's assertion of the privilege against self-incrimination satisfies the unavailability requirement of the against-interest exception [citation]." (Italics in original.) *Leach* thereafter, at pages 438-442, analyzes what type of statements are against penal interest and admissible and distinguishes those from intertwined disserving statements and those involving other persons (absent conspiracy) and *not* admissible. In summation, *Leach,* at page 441, states: "In the absence of any legislative declaration to the contrary, we construe the exception to the hearsay rule relating to evidence of declarations against interest set forth in section 1230 of the Evidence Code to be inapplicable to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant.[17]" ▮ We quote only a portion of footnote 17: the court there said: "We held in [*People* v.] *Aranda* that in a joint trial evidence of a self-incriminating extrajudicial statement by one defendant, although competent against the declarant, is nevertheless inadmissible at trial if it includes any language implicating a codefendant which cannot be 'effectively deleted without prejudice to the declarant.' (63 Cal.2d [518] at p. 530 [47 Cal.Rptr. 353, 407 P.2d 265].)"

Applying this rule to the problem before us, there is no other conclusion to be reached but that Mrs. Bullard's statements, while inculpatory, nevertheless so included condemning facts against defendant that error was present in the admission of the statements.

Although the evidence other than the inadmissible statements could reasonably support a conviction, we cannot say that that evidence was so strong that no prejudice resulted from the admission of the inadmissible statements.

▮ There is a constitutional question (right of confrontation) of error committed by the prosecutor by getting before the jury what is tantamount to devastating direct testimony by questions posed to a witness claiming the Fifth Amendment privilege to which we must address ourselves. We note here the questions posed to Mrs. Bullard and to which she exercised her right not to answer because the answers might

tend to incriminate her, were quite different from those posed to Mrs. Martel.[3]

The questions asked of Mrs. Bullard are of the same type condemned in *People* v. *Shipe, supra,* 49 Cal.App.3d 343, 355. In the instant case, just as in *Shipe* "the error committed in the instant case is of constitutional dimensions, and the question we must answer is whether it is clear beyond a reasonable doubt that the error did not influence the jury's verdict. (*Chapman* v. *California,* 386 U.S. 18, 23-24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065] . . . .)" Here, as in *Shipe,* "[t]he evidence of appellant's guilt was entirely circumstantial and the prosecutor, through the guise of cross-examination, succeeded in getting before the jury a vivid picture of what he believed actually occurred . . . . It stretches the imagination to believe that the prosecutor's questions did not influence the verdict. (*People* v. *Modesto, supra,* 66 Cal.2d 695, 712 [59 Cal.Rptr. 124, 427 P.2d 788].)"[4] (*Id.* at p. 355.)

The judgment is reversed.

Kaus, P. J., and Ashby, J., concurred.

A petition for a rehearing was denied January 4, 1978, and respondent's petition for a hearing by the Supreme Court was denied February 1, 1978.

---

[3]"Mrs. Bullard, for the next hour between 7:00 and 8:00 did you see Rocky Bullard repeatedly strike Carrie about the head because she had wet her pants?

"On Sunday—rather, Saturday March the 20th did you tell your neighbor, Mrs. Martel, that Rocky Bullard repeatedly knocked Carrie off the toilet, hitting her head against the sink?

"On April 7, 1976 at the Whittier Police Department did you tell Officer Shaffer that you had seen Rocky Bullard repeatedly hit Carrie and knock her off the toilet and hit her head against the sink?

"On April 19 between the hours of 7:00 and 7:30 did you see Rocky Bullard pull Carrie by her hair which was in a ponytail at that time, march her off into the bathroom and strike her again for wetting her pants? . . . The question is amended to the date of March 19, Miss.

"Did you tell your neighbor, Mrs. Martel on March 20, Saturday, that you had seen Rocky Bullard pull your daughter Carrie by the hair, march her to the bathroom and strike her about the head?

"On March 20, Saturday, did you refuse to let Mrs. Martel see your daughter?

"On the morning of April the 20th, which would be a Saturday, did you notice some swelling about the eyes of your daughter, Carrie? . . . I am sorry. That would be March 20."

[4]It is apparent that on retrial evidence which was not available to the prosecution initially may now be readily introduced. We note that Mrs. Bullard was charged with a misdemeanor and under normal progression of prosecution, her case would have proceeded to trial. If she has been convicted, it is reasonable to assume she would have served the sentence since 17 months will have passed from this trial to finality of opinion. If this be the case, no claim of the Fifth Amendment appears applicable.