[Crim. No. 44688. Second Dist., Div. One. Aug. 1, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
RAYMOND FRUTOS, Defendant and Appellant.

**COUNSEL**

Hugh Anthony Levine, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Carol Wendelin Pollack and Susan Lee Frierson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CARSTAIRS, J.**\*—A jury found defendant, Raymond Frutos, guilty of first degree murder (Pen. Code, § 187), and that he was armed and used a firearm (Pen. Code, §§ 12022.5, 12022, subd. (a)). The court sentenced him to state prison for a term of 27 years to life. He appeals from the judgment.

Appellant urges two principal grounds of error:

1. The admission of the hearsay statements of a fellow gang member under section 1230 of the California Evidence Code, as declarations against penal interest constituted prejudicial error.

2. Appellant was deprived of his constitutional right to a public trial when the trial judge excluded members of his family from the courtroom during the testimony of a prosecution witness.

### PROSECUTION EVIDENCE

On September 6, 1980, three members of the 18th Street gang were killed by gang members of the Harpies. There is a gang code of honor which requires one gang to retaliate against the other gang for "damages." At about 4 a.m. on September 18, Dora and Michael Mitchell were lying in bed in their second floor apartment at 2727 Budlong in the City of Los Angeles. They heard gunshots and Mr. Mitchell got up to investigate. He went out to the balcony of his apartment where he was killed by a gunshot wound to his head. The decedent was not a gang member.

On September 18, 1980, one George Salcido resided in a ground floor apartment at 2727 Budlong. He had a reputation in the community as being a member of the Harpy gang.

A neighbor, Shon Owens, saw three or four persons leaving the scene in a Chevrolet. Another neighbor, Anna Iniquez, looked out her window and saw three men run to a Chevrolet parked in front of her house. One of the men had a rifle in his hand. When she saw the rifle she pulled down her window shade. Shortly before seeing the three men run to the Chevrolet she saw them near a van.

At a later time six empty .30 caliber casings were found near the van. Such casings can be fired by an M-1 rifle. Several lead fragments from a

---

\*Assigned by the Chairperson of the Judicial Council.

.30 caliber carbine bullet jacket were found on the balcony where Mr. Mitchell was murdered. Also found in the door of Mr. Mitchell's balcony was a .32 caliber expended lead slug.

After Mr. Mitchell's murderers had left the scene Mr. Salcido discovered that the windshield of his car, parked in front of his apartment, had been broken out.

At approximately 4:15 to 4:30 a.m. on September 18, 1980, appellant was observed with a rifle at Rocky Glover's house. Subsequently, a .32 caliber handgun was found in Rocky Glover's bedroom. It is possible that a bullet found in the wall of Mr. Mitchell's balcony could have been fired from the handgun. Appellant and Rocky Glover were both members of the 18th Street gang.

On November 11, 1980, Rocky Glover told a cellmate in county jail that he had participated in the killing on Budlong by driving an automobile with two other people to the scene, providing an M-1 rifle and a .32 caliber pistol and holding one of the weapons in his hand when he got out of the car.

Sometime in November 1981, appellant volunteered some statements to his uncle Raymond Gallegos about the murder for which Rocky Glover was incarcerated.

" 'You know, that Harpy murder that he [Rocky Glover] is in jail on? Well, he didn't kill the guy; I did. Rocky was just the decoy. He fucked up the Harpy's car to get them to come out, and when he did, I shot him.' " Appellant went on to state that the gun which was used was an M-1.

Appellant's uncle expressed disbelief of appellant's story but appellant insisted that it was true. His uncle then told him that they had killed an innocent man. Appellant responded, "No, he wasn't innocent. He was in that gang. They did one of our guys or something like that."

Defendant did not testify.

■ Was it error to admit the statements of Rocky Glover under Evidence Code section 1230? Evidence Code section 1230 provides as follows: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in

his position would not have made the statement unless he believed it to be true."[1]

Out of the presence of the jury Rocky Glover was called and invoked his Fifth Amendment privilege against self-incrimination. The People called one William Kogan as a witness. On November 11, 1980, Kogan was a jail mate of Rocky Glover who was incarcerated in the same cell block. Kogan was currently serving a sentence of 25 years in the State of Iowa for robbery, had other charges pending and had been convicted of auto theft and robbery on 5 separate occasions owing 13 and 2/3 years to the State of California. He had not previously been acquainted with Glover.

The following extrajudicial statements of Rocky Glover were presented to the jury through the testimony of William Kogan. Kogan's testimony was objected to by appellant's counsel on the grounds that it would be hearsay in violation of appellant's Sixth Amendment right of confrontation. At issue are the statements attributed to Rocky Glover as follows:

"Q. [Deputy District Attorney] What specifically did Rocky Glover tell you about his his participation, if any, in a killing of a person on Budlong?

"A. [Kogan] Well, he told me he had participated only in the sense that he drove an automobile with two other people to the scene, and that he had provided the weapons; like one of the weapons he had in his hand when he got out of the car.

"Q. Did he tell you what kind of guns he had provided?

"A. It was an M-1 rifle and a .32 caliber pistol.

"Q. Did he say anything to you about somebody maybe saw him out there?

"A. Yeah. He indicated that some person had seen him from across the street, in the second floor or third floor, whatever it might be. They had been looking either out of the window or standing out on the patio or something of that nature.

---

[1]Evidence Code section 1230. "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

"He thought that person might just be able to identify him. He was very concerned about that.

"Q. Did he tell you something about that person pulling a curtain shut?

"A. He indicated until the curtain or something of that nature was pulled, he was visible from that area. .

". . . . . . . . . . . . . . . . . . . . .

"A. [Kogan] Here I was talking to a man that admitted he was a very active gang member, and the expressions on his face and in his eyes when he talked about killing someone, and it turned out to be the wrong person, it didn't bother him at all."

Appellant contends he was denied his constitutional right of confrontation when the trial court admitted the extrajudicial statements of Rocky Glover because those statements were not specifically disserving to nor distinctly against Glover's penal interest; nor were they clothed with the indicia of reliability; citing the case of *People* v. *Shipe* (1975) 49 Cal.App.3d 343, 352-354 [122 Cal.Rptr. 701]. That case is distinguishable from this. In *Shipe,* the proffered declarations against penal interest were made by the declarants to law enforcement authorities after the declarants had been arrested and charged with serious offenses. In addition the proffered declarations against penal interest were exculpatory in the sense that the declarants blamed a coparticipant for the commission of the greater offense while admitting complicity to some lesser degree. Under those circumstances the Court of Appeal concluded in *Shipe* that the declarations were not clothed with sufficient indicia of reliability to satisfy the confrontation clause of the United States Constitution.

However, here, unlike in *Shipe,* declarant did not make his statements to law enforcement authorities, but rather to a fellow prisoner who was a stranger to him and who was not in any position to benefit the declarant. The statements were spontaneous and were made at a time when the declarant had no apparent reason to lie.

As a participant, furthermore, Glover clearly had sufficient knowledge about the incident of which he spoke and the circumstances of his participation in the killing of the victim did in fact subject him to the risk of criminal liability to a degree that a reasonable man in his position would not have made the statements unless he believed them to be true.

■ Constitutional requirements demand that a declaration against penal interest be admissible under Evidence Code section 1230 only as to those

statements which are specifically disserving to the interest of the declarant. No collateral assertions can be permitted. (*People* v. *Leach* (1975) 15 Cal.3d 419, 441 [124 Cal.Rptr. 752, 541 P.2d 296]; *People* v. *Coble* (1976) 65 Cal.App.3d 187, 192 [135 Cal.Rptr. 199].) Moreover, even where these requirements have been met the statements must be excluded if they are so rife with condemning facts against the defendant that they are devastating or crucial to his case. (*People* v. *Bullard* (1977) 75 Cal.App.3d 764, 771 [142 Cal.Rptr. 473]; *People* v. *Coble, supra,* 65 Cal.App.3d 187, 194; *Dutton* v. *Evans* (1970) 400 U.S. 74, 87 [27 L.Ed.2d 213, 226, 91 S.Ct. 210].)

 Appellant argues that the statements of Glover are not specifically disserving to his interest, and further, that they are devastating or crucial to his case, and therefore should have been excluded.

We do not agree.

The hearsay statements of Rocky Glover to William Kogan do satisfy Leach's requirement. It was "specifically disserving" to Glover for him to admit that he had driven two people to the scene of the murder, had provided an M-1 rifle and a .32 caliber pistol, had held one of the weapons in his hand when he got out of the car, and generally talked about killing someone who turned out to be the wrong person. Glover's statement that he was concerned that a person at the murder scene had been in a position to identify him is "specifically disserving" in that it is in effect an admission that Glover was at the scene with guilty knowledge and participation at the time of the murder.

Glover's statement is wholly inculpatory and he subjected himself to a conviction of murder.

It cannot be considered crucial or devastating to appellant's case. Nothing in his statement implicates appellant and appellant is not referred to in any way. The statement is merely corroborative evidence offered on the issue of whether the crime happened in a certain manner. Its admission did not violate appellant's constitutional right to confrontation.

The case of *People* v. *Coble, supra,* 65 Cal.App.3d 187, is distinguishable. In *Coble* the Court of Appeal held that the proffered hearsay declaration about a liquor store robbery was not specifically disserving to the declarant since the declarant denied that he knew that the defendant was going to commit the robbery when the declarant drove the defendant to the liquor store.

Finally, arguendo, if there were error in admitting the hearsay statements made by Glover the error was harmless. The *Watson* standard applies. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Appellant's conviction can be reversed only if it is reasonably probable that a result more favorable to him would have been reached in the absence of error. ■ If, however, the erroneously admitted hearsay statements include powerfully incriminating extrajudicial statements of a codefendant, the ensuing conviction is permitted to stand only if the reviewing court is able to declare a belief that the error was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Leach, supra,* 15 Cal.3d 419, 445-446.) Since the hearsay statements at issue in the instant case were not "powerfully incriminating" the Watson standard for reversible error applies. The killing of Michael Mitchell, like the killing in Leach, was already established beyond doubt by the evidence of Frutos' own utterances.

### EXCLUSION OF APPELLANT'S FAMILY MEMBERS FROM THE COURTROOM DURING THE TESTIMONY OF RAYMOND JOEY GALLEGOS WAS NOT ERROR

■ Under normal conditions a public trial is one which is open to the general public at all times. This right of attendance may be curtailed under special circumstances without infringement of the constitutional right but it cannot be denied altogether nor can it be restricted except in cases of necessity. (*People* v. *Byrnes* (1948) 84 Cal.App.2d 72 [190 P.2d 290], also *People* v. *Remiro* (1979) 89 Cal.App.3d 809, 847 [153 Cal.Rptr. 89, 2 A.L.R.4th 1135].)

■ Raymond Gallegos is the appellant's uncle who was called to testify by the prosecution. At the start of his testimony members of his and appellant's family were in the courtroom. The prosecutor asked him about a conversation appellant had had with him about the murder for which Rocky Glover was in jail. In response to the prosecutor's questions he was evasive and vague. "Q. Did he say something more about what he may have done in relation to that crime? [¶] A. I really don't recall. I don't remember. [¶] Q. Right now as you sit there I want you to think real hard. [¶] Can you remember anything more than what you just told us . . . . [¶] A. That's all I can remember right now."

He was then questioned about an interview he had had in an Inglewood police station about the conversation with appellant, and expressed difficulty remembering that interview. After a recess which was taken to enable him to review a tape recording and a transcript of that interview he was then asked what else appellant had told him. His answer was, "You have it on tape."

At this point the prosecutor asked the court to exclude appellant's family from the proceedings during his testimony. Appellant's family was also the family of the witness.

The court noted, "the witness is very uncomfortable about his testimony," and over the objection of appellant granted the prosecutor's request. Initially, thereafter, after some renewed evasiveness by the witness, the deputy district attorney asked the witness if he found it uncomfortable testifying against his nephew. His reply was as follows "It's a matter of life and death; my mother's and my father's. [¶] That's their grandson I'm testifying—. . . ." After the trial court reminded Mr. Gallegos that he was sworn to tell the truth he then became direct, and testified to the acknowledgement by the defendant of his part in the murder.

Although the record does not reflect the precise moment when appellant's family returned to the courtroom it is clear from the transcript of the trial proceedings that the day after Mr. Gallegos' testimony appellant's mother was again seated in the courtroom during the proceedings.

By deciding to exclude family members from the courtroom during Mr. Gallegos' testimony the trial court implicitly made a finding that Mr. Gallegos' state of mind was such that he would be unable to testify fully, freely and completely in their presence. His outburst, quoted above, his testimony being a matter of life and death for his mother and father is clear evidence of the strain under which he must have been. In *People* v. *Byrnes, supra,* 84 Cal.App.2d at page 78, the court stated: "What we have said is not intended to apply to a situation in which it would appear to the court that a material witness, because of emotional disturbance, would be substantially prevented from giving testimony in the presence of a crowd of spectators."

The exclusion was limited to the witness' family and was not error.

Appellant's remaining contentions are found unnecessary for extended discussion. Any prosecution misconduct in closing argument was cured by the court's instruction to the jury at appellant's request.

■ As to the language in the information alleging enhancement pursuant to section 12022.5 of the Penal Code (personally used a deadly and dangerous weapon, to wit, a rifle and/or handgun) appellant was not deprived of his right to a unanimous verdict as to which weapon was used. There was a single act in issue, the use of a deadly and dangerous weapon. Appellant admitted this when he said to his uncle, "*I* shot him." (Italics added.) Whether the weapon was a rifle or handgun is not an issue. (*People* v. *Nor Woods* (1951) 37 Cal.2d 584, 586 [233 P.2d 897].)

We affirm the judgment.

Hanson (Thaxton), Acting P. J., and Lillie, J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 26, 1984.

---

*Assigned by the Chairperson of the Judicial Council.