BAXTER, J., Concurring and Dissenting.
Minor portions of William Morris’s interview in police custody, even as redacted for use at trial, may have been improperly admitted against defendant under the penal-interest exception to California’s hearsay rule (Evid. Code, § 1230), because they were not “specifically disserving” to the nontestifying Morris himself and thus lacked sufficient indicia of reliability. (People v. Leach (1975) 15 Cal.3d 419, 441 [124 Cal.Rptr. 752, 541 P.2d 296] (Leach).) If so, admission of these same fragments may also have violated the Sixth Amendment’s confrontation clause, because they neither fell within a “firmly rooted” hearsay exception *621 nor otherwise exhibited “particularized guarantees of trustworthiness” sufficient to dispense with cross-examination. (E.g., Lilly v. Virginia (1999) 527 U.S. 116, 124-125 [119 S.Ct. 1887, 1894, 144 L.Ed.2d 117] (plur. opn.) (Lilly); Ohio v. Roberts (1980) 448 U.S. 56, 66 [100 S.Ct. 2531, 2539, 65 L.Ed.2d 597].) However, I believe any error in the admission of these isolated segments was harmless by any applicable standard. Contrary to the majority, I would therefore reverse the judgment of the Court of Appeal and uphold defendant’s convictions.
I disagree vigorously with the majority’s broader conclusion that Morris’s statement was inadmissible in any form. The majority reason that even if Morris made some admissions strictly against his penal interest, his entire statement, including those portions incriminating only to Morris himself, is nonetheless disqualified as unreliable under the Evidence Code because the statement was given in police custody, identified coparticipants, and included Morris’s efforts to present himself in a sympathetic light. On the contrary, I conclude Morris’s basic description of his participation in a drive-by shooting at a particular time and place, as properly redacted to eliminate any hint of self-justification, blame shifting, or incrimination of others, is amply trustworthy. Its admission in that form would satisfy both the letter and the spirit of the Evidence Code, and of the confrontation clause as well. By attacking Morris’s statement with a chain saw instead of a scalpel, the majority wrongly deprive the People of a reliable and important link in the circumstantial chain of proof that defendant committed the serious crimes charged against him. From this aspect of the majority’s analysis, I therefore dissent.
At the outset, as the majority must concede, major efforts were made to remove all objectionable features from the version of Morris’s statement the jury heard. In this version, as briefly presented by Sergeant O’Hanlon, Morris appears to speak in the first person singular and to describe himself as acting alone. Throughout the entire statement, as redacted for trial, there is no suggestion that others were involved. In O’Hanlon’s redacted version, Morris candidly explained that “he [i.e., Morris] decided to go do a drive by [shooting]” in retaliation against “a guy who had done a drive by shooting in the past. He [i.e., Morris] armed himself and left [Borchard Park] in his car.” (Italics added.) According to O’Hanlon, Morris described the house where the shooting occurred (a one-story blue house in Newbury Park with a basketball hoop in front), the weapon “[h\e used” (a Tec-9 pistol with a “long clip”), the number of shots “he fired” (“about 30” in semiautomatic mode), and what “he” did after the shooting (went back to Borchard Park, then returned home). (Italics added.) The prosecutor asked O’Hanlon whether Morris had said anything about the role of Eran Knox, the chief *622 prosecution witness, in the shooting. O’Hanlon replied Morris had explained that “Eran remained in the park when he [i.e., Morris] left to do the drive by, and that Eran had tried to talk him [i.e., Morris] out of doing the shooting.” (Italics added.)
These statements all appear specifically disserving to Morris by describing, without elaboration, his own active participation in a serious criminal enterprise. They reveal, in and of themselves, no effort by Morris to curry favor, minimize his personal culpability, identify accomplices, or shift the principal blame to others. Indeed, in redacted form, they impliedly overstate Morris’s complicity by insinuating that he himself was the instigator of the incident, and that, having decided to act, he could not be dissuaded by Knox, who did not participate in the shooting. As to the basic events of the incident, and Morris’s role therein, these statements so far incriminated rather than favored or exculpated Morris that “a reasonable [person] in [Morris’s] position would not have made [them] unless he believed [them] to be true.” (Evid. Code, § 1230.)[1] Hence, they were properly admissible under the statutory exception to California’s hearsay rule. For the same reason, I believe, they exhibited particularized guarantees of trustworthiness sufficient to satisfy the confrontation clause. (See, e.g., Lilly, supra, 527 U.S. 116, 124-125 [119 S.Ct. 1887, 1894].)
Arguably the redacted statement, as admitted in court, should not have included Morris’s insistence that he fired high, at the roof, to avoid hurting anyone. Nor, perhaps, should the jury have heard Morris’s claim that when he learned from television a lady had been wounded in the leg, he realized he had shot at the wrong house. These particular remarks might be viewed as attempts by Morris to portray his actions and intentions as sympathetically as possible. Seen in that light, they are not presumptively trustworthy as specifically disserving to Morris’s penal interest, and are thus not within the narrow hearsay exception provided by the Evidence Code. For similar reasons, and to the same limited extent, a violation of the confrontation clause also may have occurred.
But I fail to see any possibility of prejudice from these minor lapses. They cast no aspersions on defendant, and they were collateral to defendant’s guilt *623 or innocence of the charged crimes. That Morris disclaimed an intent to Mil or injure anyone, and expressed regret for shooting at the wrong (rather than the “right”) house, in no way insinuates that defendant, whose participation and role were excised from Morris’s redacted statement, felt or acted more culpably.[2]
The majority insist that by erroneously including Morris’s claim “he” fired high to avoid injuring the house’s occupants, the redacted statement prejudiced defendant by implying, in context, that defendant did not fire high, and that defendant's bullet must therefore have struck Ms. Sullivan. This theory is speculative in the extreme. As the jury heard, Morris admitted he intentionally discharged some 30 bullets at a private residence, having reason to believe, because “he saw a light on in a front window,” that the house was then occupied. His shots were fired from the window of a car on the street in front of the residence. Even if Morris hoped otherwise, no rational inference arises that Morris was successful in directing this profligate and indiscriminate attack away from inhabited areas of the target residence, and that the injurious bullet must thus have been fired by someone else.
Nor, as indicated above, does the redacted statement imply that defendant, to whom all reference was omitted, acted differently from Morris, and, unlike Morris, took intentional aim at areas where people were likely to be injured.[3] The prosecutor made no attempt to exploit these aspects of Morris’s statement to argue that defendant was the one who wounded Ms. Sullivan.
The prosecution did seek to link defendant to the injurious bullet. Moreover, the prosecution’s theory depended by inference on another portion of Morris’s statement as heard by the jury, i.e., Morris’s disclosure that he used a nine-millimeter machine pistol, a Tec-9, in the assault. Other evidence suggested that the bullet which most likely wounded Ms. Sullivan came *624 from a 7.62-millimeter assault rifle. The prosecutor urged, by process of elimination, that if Morris used the Tec-9, defendant must have fired the 7.62-millimeter weapon.
However, I see no basis for reversal in these facts, for I am convinced Morris’s Tec-9 statement was presumptively reliable and thus admissible. In referring to the Tec-9, Morris was simply describing, without self-justification or blame shifting, the weapon he himself used to fire “about 30” shots at the Sullivan home. The reference appears specifically disserving to Morris, and thus likely truthful. There is no indication that the reference was self-exculpatory in context, and thus might be a lie. (See, e.g., Williamson v. United States (1994) 512 U.S. 594, 603 [114 S.Ct. 2431, 2436-2437, 129 L.Ed.2d 476] (Williamson).) Specifically, the record discloses no evidence that, at the time Morris made the Tec-9 statement, he had any reason to believe, or thought the police believed, the bullet which struck Ms. Sullivan came from any other weapon. Hence, there is no basis to infer that by identifying his own weapon as a Tec-9, Morris sought to curry favor or shift blame.[4]
For these reasons, I am persuaded that any improperly admitted excerpts from Morris’s police statement caused no prejudice to defendant. (See Chapman v. California (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]; People v. Watson (1956) 46 Cal.2d 818-836-837 [299 P.2d 243].) I would therefore uphold defendant’s convictions, and would overturn the reversal entered by the Court of Appeal.
But the majority’s analysis contains a far more serious flaw. The majority alternatively hold that defendant was prejudiced because no part of Morris’s police statement was properly admissible. This is so, the majority insist, because Morris’s statement occurred in police custody, with a motive to curry favor and shift blame, and included such self-exculpatory efforts. Hence, the majority conclude, even those portions of Morris’s statement that were specifically and solely self-incriminatory are not trustworthy enough to allow their hearsay use against defendant. I am not persuaded.
Many cases confirm that statements, particularly those made in circumstances where there is a motive to shade or distort the truth, are not *625 necessarily credible, and thus admissible, as a whole simply because they include admissions of criminal culpability. (E.g., People v. Campa (1984) 36 Cal.3d 870, 883 [206 Cal.Rptr. 114, 686 P.2d 634].) It is certainly true that “ ‘a self-serving statement lacks trustworthiness whether it accompanies a disserving statement or not.’ ” (Leach, supra, 15 Cal.3d 419, 439, fn. 15, quoting Jefferson, Declarations Against Interest: An Exception to the Hearsay Rule (1944) 58 Harv. L.Rev. 1, 60, italics added.) And context may reveal that a particular statement, though self-incriminatory on its face, actually has exculpatory meaning or purpose which undermines its trustworthiness. (E.g., Williamson, supra, 512 U.S. 594, 603-604; People v. Coble (1976) 65 Cal.App.3d 187, 191 [135 Cal.Rptr. 199] (Coble).)
Hence, it has long been settled in California that the hearsay exception for declarations against penal interest does not apply to “collateral assertions within declarations against penal interest.” (Leach, supra, 15 Cal.3d 419, 439, italics added.) If, for example, a statement, whether to the police or others, admits the declarant’s culpability only in the context of limiting it, as by expressly or impliedly shifting major blame to others, it is inadmissible to that extent. (E.g., Coble, supra, 65 Cal.App.3d 187, 191; see People v. Bullard (1977) 75 Cal.App.3d 764, 770 [142 Cal.Rptr. 473] [“inseparable combination of exculpatory and inculpatory matter”].) Only those portions of a hearsay statement that are “specifically disserving” to the declarant (Leach, supra, at p. 441), i.e., “ ‘distinctly’ against the declarant’s penal interest” (People v. Shipe (1975) 49 Cal.App.3d 343, 354 [122 Cal.Rptr. 701]), and thus presumptively trustworthy, may be admitted.
But the majority turn these truisms on their heads. They hold, contrary to logic, that evén if particular utterances were strictly disserving to the declarant when made and can easily be isolated from collateral or exculpatory aspects of the declarant’s statement, the self-incriminatory utterances are still not trustworthy, and thus are not admissible as hearsay in an accomplice’s separate trial, if they were accompanied by self-serving statements and were made under circumstances suggesting some general motive to lie or distort. The majority thus throw out the baby with the bathwater. The effect of the majority’s rule is to exclude most police confessions by nontestifying accomplices out of hand, even those portions so clearly and strictly self-incriminatory when uttered that they are almost certain to be true.
The majority cite no decision, and I am aware of none, that requires such a result. On the contrary, the law has assumed, at a minimum, that if collateral and self-exculpatory elements of a statement can be separated and redacted, such that no flavor of false self-justification or blame shifting remains, the strictly self-incriminatory portions may be admitted as trustworthy under the penal-interest exception to the hearsay rule. (See, e.g., Leach, *626 supra, 15 Cal.3d 419, 439-441; Williamson, supra, 512 U.S. 594, 598-604 [114 S.Ct. 2431, 2434-2437] (plur. opn. of O’Connor, J.); id. at pp. 605-606 [114 S.Ct. atp. 2438] (cone. opn. of Scalia, J.); id. at pp. 611-621 [114 S.Ct. at pp. 2440-2445] (cone. opn. of Kennedy, J.) [construing federal penal-interest rule].)
Similarly, because of the motive to shift blame falsely, and the consequent need to cross-examine the accuser, the Sixth Amendment’s confrontation clause may most often prohibit the use against an accused of directly incriminating statements against him that were made by a nontestifying accomplice while in police custody. (See, e.g., Lilly, supra, 527 U.S. 116, 130-139 [119 S.Ct. 1887, 1897-1901] (plur. opn. of Stevens, J.); id. atp. 143 [119 S.Ct. at p. 1903] (cone. opn. of Scalia, J.); Lee v. Illinois (1986) 476 U.S. 530, 539-547 [106 S.Ct. 2056, 2061-2065, 90 L.Ed.2d 514]; Douglas v. Alabama (1965) 380 U.S. 415, 418-420 [85 S.Ct. 1074, 1076-1077, 13 L.Ed.2d 934]; cf. Bruton v. United States (1968) 391 U.S. 123 [88 S.Ct. 1620, 20 L.Ed.2d 476].) But again, similar suspicions do not logically attach to those portions of such a statement that were strictly self-incriminatory, even where, apart from any motive of the accomplice to shift blame or incriminate others, the accomplice’s admission of his own participation may form an indirect or circumstantial link in the chain of evidence against the defendant. (Cf. Williamson, supra, 512 U.S. 594; Richardson v. Marsh (1987) 481 U.S. 200, 208 [107 S.Ct. 1702, 1707-1708, 95 L.Ed.2d 176].)
Though Morris made some effort to present his case sympathetically to the authorities, his police statement also included candid admissions of his own substantial participation in a drive-by shooting at a particular time and place. For purposes of defendant’s trial, these self-incriminatory disclosures could easily be separated from any collateral and self-exculpatory elements of Morris’s statement. If properly redacted, I believe Morris’s statement was admissible against defendant under both statutory and constitutional principles. The actual redaction here may not have been strict enough, and defendant’s jury may have heard a bit too much. I find any such lapses harmless, however, and I would therefore reverse the judgment of the Court of Appeal. But even if I agreed with the majority that prejudice arose from an insufficient redaction, I would not deprive the People of all opportunity to use Morris’s statement, as properly limited, in any retrial.
Kennard, J., concurred.

Circumstances may occasionally arise in which even a strictly and narrowly self-damning statement lacks sufficient indicia of trustworthiness to be admitted under the penal-interest exception. (See, e.g., People v. Frierson (1991) 53 Cal.3d 730, 744-746 [280 Cal.Rptr. 440, 808 P.2d 1197] [no abuse of discretion in rejecting defense hearsay evidence of third party’s admission he committed the charged murder, where admission was made to defense investigator long after defendant was judged guilty, and likely motive was to help defendant with little personal risk].) But insofar as Morris, in police custody and facing criminal prosecution, admitted his participation in a drive-by shooting, his admissions exhibit patent indicia of reliability.

The jury seems at least as likely to draw the contrary inference, i.e., that if defendant was also involved in the shooting, for similar reasons, he also sought to avoid injury to anyone, or at least anyone other than the intended target. Such an inference would be accurate in light of Morris’s unredacted statement, which indicated that “we didn’t want to hurt anybody that was innocent,” that “we" relied on the directions of a third participant, but that the group drove by the house twice because “we wanted to be sure” it was the right house. (Italics added.)

Again, the jury was at least as likely to assume defendant acted similarly to Morris, and Morris’s unredacted statement confirms that view. As noted above, Morris actually spoke in the plural voice when disclaiming intent to injure innocent persons, and, for the most part, he insisted that “we” aimed high to avoid such injury. According to Morris, “we” weren’t sure it was the right house, and (apparently referring to the physical pattern of bullet holes he assumed the police had found) “that’s why the bullets were high.” (Italics added.) Confronted with O’Hanlon’s comment that “[u]nfortunately, [they were] not high enough,” Morris could only answer, “Yeah.” It is true that at one point, O’Hanlon pointedly asked Morris whether “you both aim[ed] high,” and Morris responded, “I don’t know if he [i.e., defendant] did or not.” But if this was an implied accusation of defendant, the jury never heard it.

Nothing in the full transcript of Morris’s November 23, 1994, interview at the East Valley sheriff’s station indicates Morris was told anything about a specific type or caliber of bullet that struck the victim. At trial, Sergeant O’Hanlon testified he had a brief earlier conversation with Morris, in a police car, just after Morris’s arrest. After reading Morris his rights, O’Hanlon asked whether, having these rights in mind, Morris wished to talk about what happened. Morris replied “that he understood his rights, but that he didn’t understand the situation,” whereupon O’Hanlon “explained the situation to him” and Morris asked if he could talk to O’Hanlon “later” at the station. Nothing in this exchange indicates O’Hanlon apprised Morris of such details as the type of weapon that fired the injurious bullet.