Opinion
 

 LAMBDEN, J.
 

 Defendants Jeffrey Payton Bryden (Bryden) and Joaquin Leon Padin (Padin) appeal from a judgment following their conviction of second degree murder. Defendants were jointly tried for the murder of Brian Friberg (Friberg). The published portion of this appeal pertains to Padin’s challenges to his conviction, and the unpublished portion involves Bryden’s appeal. Defendants raise various challenges to their conviction and Padin argues in his petition for habeas corpus relief that he had ineffective trial counsel. We are not persuaded by any of defendants’ arguments.
 

 Background
 

 An information filed on October 26, 1994, charged defendants with the murder of Friberg (Pen. Code, § 187) with a deadly and dangerous weapon
 
 (id.,
 
 § 12022, subd. (b)). The information also alleged that Padin had two prior serious felony convictions
 
 (id.,
 
 §§ 667, subd. (a), 1192.7, subd. (c)) and Bryden had four prior prison terms
 
 (id.,
 
 § 667.5, subd. (b)).
 

 Defendants pleaded not guilty on October 27, 1994. Both defendants moved to sever their trial, and the court denied their motions.
 

 On September 13, 1995, after a 13-day jury trial, the court declared a mistrial when the jury was unable to reach a verdict. The hung jury was split: Nine voted for acquittal and three voted guilty.
 

 Defendants pleaded not guilty to the reinstituted charges on October 13, 1995. Both defendants moved for severance of the trial, which was again denied.
 

 
 *166
 
 A second jury trial began on March 25, 1996, and defendants moved to bifurcate the trial on the prior convictions and prison term allegations. The court granted the motions.
 

 At trial, the prosecution presented witnesses Robert Vandevort (Vandevort) and his wife Kathy Vandevort (Kathy). Both Vandevort and Kathy were granted immunity for all nonviolent offenses in exchange for their cooperation.
 

 Vandevort testified that he had numerous felony convictions, including being a convicted ex-felon in possession of a firearm and accessory after the fact in connection with this case. He also admitted prior drug use and acknowledged that he had stabbed several people while in custody at different penal institutions.
 

 Vandevort met Padin when they were cellmates at Corcoran prison. While in prison, they discussed their plans after their release from prison, which included robbing people, setting up a methamphetamine lab, and eventually “go[ing] straight.” Padin told Vandevort that he had connections with “big time” crooks in Northern California.
 

 When the two men were released on parole in 1993, they remained in contact. Padin went to live at his aunt’s home in East Contra Costa County, which was known as the “ranch.”
 

 In November 1993, Vandevort and Kathy came to the ranch and brought Bryden and Friberg with them. Bryden and Friberg allegedly knew how to make methamphetamine. Vandevort, Kathy, Friberg, and Padin stayed at the ranch and Bryden stayed a couple of miles away in the basement of the house of Padin’s cousin.
 

 Vandevort, Padin, and a friend of Fadin’s, Lisa Eastridge (Eastridge), met with various individuals, attempting to set up robberies. When no significant opportunity materialized, Vandevort began to have misgivings about Padin and believed he was “all talk and no action.”
 

 During this time, tension festered among the men. Vandevort stabbed Bryden while he was sleeping. On another occasion, a number of people were sitting at the table when Bryden commented that Kathy and Friberg were sexually involved. Vandevort charged into the kitchen and punched Bryden into the kitchen wall. Bryden slammed Vandevort to the floor and jumped on top of him. Vandevort testified that Padin then stabbed Bryden in the back, but Padin testified that Vandevort stabbed Bryden in the back.
 

 
 *167
 
 Eventually Vandevort and Padin obtained a small amount of phenyl oil, which could be used to manufacture methamphetamine. Friberg, however, was unable to make methamphetamine, and succeeded only in converting the oil into a paste.
 

 Vandevort and Kathy then left the ranch to go to Southern California for the Thanksgiving holiday. Friberg and Bryden were to remain at the ranch to continue trying to manufacture methamphetamine.
 

 On December 3, 1993, Vandevort and Kathy drove back to Northern California, because Padin had told him that he had set up a robbery of a drug dealer. When Vandevort and Kathy arrived, they found that the gate to the ranch was padlocked. According to Vandevort, Bryden met them at the gate and reported that Padin had the key but was gone. Kathy testified that Bryden did not meet them at the gate; rather, he was already inside the compound when they approached the ranch. Both Vandevort and Kathy agreed that Vandevort used bolt cutters to gain entry.
 

 Once they entered the ranch, Bryden approached Vandevort and told him he needed to speak with him in the garage. After they entered the garage, Bryden, according to Vandevort, disclosed that Friberg was dead. Bryden confided that he had brought a small knife into the garage and repeatedly stabbed Friberg; he also reported that he had cut Friberg’s throat. Vandevort observed an object which he believed to be Friberg’s body; it was wrapped in “curtain sheet-type material” with the ends sealed.
 

 When Padin returned, Vandevort testified that he asked Vandevort if Bryden had told him about Friberg. Padin later told Vandevort that he had walked into the garage when Friberg was shooting into the wall. Padin then hit Friberg in the back of the head with a baseball bat. Padin stated that he left the garage and entered the kitchen to retrieve a larger knife. When he returned, he stabbed Friberg in the heart. Vandevort stated that Padin instructed Bryden while Bryden was stabbing Friberg: “That’s how you do it .... Now cut his throat.” Padin also told Vandevort that Friberg had been stealing from him.
 

 On December 3, 1993, Vandevort, Kathy, Bryden, Padin, and Fadin’s girlfriend, Debbie Oram (Oram), discussed how to dispose of Friberg’s body. They decided to have Vandevort and Bryden transport the body to the river in the trunk of Vandevort’s automobile. According to Vandevort, Padin and a “kid” at the ranch drove ahead of Vandevort and Bryden to point out the road to take. Padin and the other young man left after telling them to go down a dirt road. Kathy, however, stated that Padin remained at the ranch when Vandevort and Bryden left to bury the body.
 

 
 *168
 
 Vandevort. and Bryden buried the body; they then drove a short distance and went fishing.
 

 While Vandevort and Bryden were gone, Kathy and Oram attempted to remove the bloodstains in the garage. Kathy and the others examined Friberg’s personal items, and Padin claimed to have found some rings that his aunt had mentioned were missing.
 

 When Vandevort and Bryden returned, Vandevort testified that Padin became angry because Vandevort had not brought back two of Friberg’s fingers. Padin had asked Vandevort to bring back two fingers so he could prove to his relative that he had killed the person who had robbed his family.
 

 The following week, Vandevort and Eastridge continued to try to set up crimes and they attempted to find Padin and Oram, who had disappeared. Vandevort wanted to locate them to ensure they could “get their stories straight” about what had happened to Friberg.
 

 Vandevort decided to steal motorcycles from Calvin Sickler’s motorcycle shop. About 1 a.m., on December 10, 1993, Vandevort, Kathy, Bryden, and Eastridge arrived at the shop with two rented U-Haul trucks, which were to be used to load the motorcycles. They aborted the scheme when they noticed a number of automobiles; Vandevort believed he had been “set up.”
 

 Later that day, Padin told Vandevort to return the tracks and meet him at the ranch so they could talk. When Vandevort and Kathy arrived at the ranch, the lights were on but no one appeared to be at the ranch. Vandevort panicked, believing that he was being set up, and Kathy and he left the ranch.
 

 The same evening, on December 10, California Highway Patrol Sergeant Mark Fields (Fields) attempted to pull over the car driven by Vandevort. A high-speed chase ensued, and Fields observed Kathy throw a gun out of the vehicle. Fields arrested the Vandevorts after their automobile spun out. A search of the car uncovered a gun with a homemade silencer, a loaded .22-shotgun with special wadcutter bullets, numerous knives, and a set of bolt cutters. Vandevort asked the officer who had reported him.
 

 The Vandevorts were transported separately to the California Highway Patrol Martinez office. Once there, Vandevort told Fields that he had information about another crime and he wanted to make a deal. The police allowed Vandevort and Kathy to talk to each other for about 15 to 30 minutes, but Fields testified that he could hear the couple conversing and they did not discuss the actual events surrounding the murder.
 

 
 *169
 
 Vandevort provided information about Friberg’s murder, and Kathy and he were transported separately to the burial site. Vandevort pointed out Friberg’s grave.
 

 The police then convinced Vandevort to make a staged or “duped” telephone call to Bryden and Padin to try to elicit incriminating statements. During the call, Padin stated that he had been taking everything out of the bedroom and garage, preparing for a garage sale. Specifically, he stated: “[W]e’ve got to organize the garage so we can have a garage sale and shit.” Vandevort testified that the reference to “garage sale” indicated to clean up untidy, bloody areas and articles left by the victim. When Vandevort told Padin that the police had asked about Friberg, Padin responded, “oh, no.” The police wanted Vandevort to make a second call, but he refused.
 

 Bryden was subsequently arrested on unrelated charges and was housed in the same jail as Vandevort. Vandevort wrote a note or “kite” to Bryden, which is a clandestine communication between two inmates. Bryden sent a kite back and Vandevort gave it to his attorney, who then gave it to law enforcement.
 

 Bryden’s kite was not admitted into evidence in the first trial, but a redacted version was admitted into evidence and read to the jury in the second trial. The unredacted kite (redacted portions are in italics) was as follows:
 
 [1]
 
 “So Rob . . . I’ve been ponder your kite for about two days now at first I was mad as hell then I got real hurt. . . Then I realized after I ‘put myself in your shoes’ that I had just better back-up and let you know what went down and where my lolalties lye . First of all my very deepest apologys for not writing you. Now that I put myself in your place and the angle at which you saw things I can hardly blame you for the way you’ve come off ... I must say it does hurt me all the way to the bone that you would even imagin I would be in cohoots with ‘[W]ok’ [Padin] and to go one step further, and tell me if I’m out of line here, but your kite seems to produce the feeling in me that you think I might be no good right along with Wok [Padin] too! Again I have to take a step back and check myself. . . Looking back I did give you a few reasons to question my loylatys i.e.: the jacket. . . The night I ran . . . The night we tryed to hook the boat up . . . Where I fucked up here was by assuming that you felt in your heart as strong as I feel about you ... Do you get what I’m saying?? You’ll never know how close I came to smoking a certain someone out there
 
 for ever continplating you might have talked on this thing!!
 
 But, you have every right to be mad at me,
 
 *170
 
 and no right at all if you knew what was in my heart!!! First of all I did leave at 3:00 am, well actually 4:00 a.m. I took a Ford Couior, down the
 
 street—If
 
 you’ll remember I had no money no tools, and the clothes on my back because someone had to leave so fast—I begged you not to go! [S]o with tears in my eyes and a huge knot in my gut I watched you go . . . Anyhow the truck didn’t have any gas.
 
 I went to a station and looked thru and found a .32 Cal. Pistol—I
 
 went passed the ranch and hid-out by
 
 the
 
 gas station around the comer till the sun came up, hoping I’d see you . . . [S]old some tools out of truck and drove to Frisco ... I couldn’t take it brother!
 
 The thought that Wok [Padin] trapped you and Kat and took you out fuckin ate me up!!! I
 
 went to Berkeley traded the Ford for Chevy van and drove on back—It was Friday night when I got back I went by the ranch and didn’t see a thing—I went back to Maria[’]s and cased it for a while—as far as I could see ‘Tudy’ was the only one their ... I went up thru the back-yard and into the garge. I went downstairs and could tell no one had been down their—I went up inside the house and ‘Tudy’ didn’t even trip, he didn’t know I was ever gone! I felt pretty comfortab[l]e cause I didn’t think Wok [Padin] would make a move with all the kids in the house—I was real tired. ‘Tudy’ fed me
 
 and gave me a line. I
 
 went down stairs about 4:00 a.m. and got ready to dye !!! “I rearanged the room got set up with a few little alarms
 
 and the shotgun and Pistol—fell asleep with a trigger in each hand.
 
 About noon Sat. the alarm tripped and I woke-up read to go—I hear a knock at the door and it’s Wok [Padin]! He wont come down though, said he didn’t know how to get the door open! Imagin that!! I
 
 finally said juck-it, hid the shot-gun and
 
 opened the door—I heard the kids running around, so again I figured I was ok . . .He was nervious as hell when he came down—I could see he didn’t have any weapons—he wasn’t nervous about me blowin his brains out he was nervous about something I couldn’t put my finger on ... I asked him where you were at and watched his reaction
 
 ... He told me you called him at 4:00 Thursday, turning the U-Hauls in and you’d be over... He said he waited and waited and you never showed
 
 ... We
 
 talked about this and that he never told me had a two o’clock app. at the ranch with his P.O.!
 
 I told him we needed to go fishing . . . Now! He said he was going to get the boat and be back in 2 hours ... I was walking him out the front door when you called—I heard what you said Brother! I figured we had the ace in the hole cause only we knew where to go . . . My plan after you told me what time it was
 
 and by the way he was acting was
 
 to get him on the boat and smoke him and sink the boat with him chaned to it. . .He never came back—The paper for Sunday (I don’t know if you’ve read these? Let me know I have them saved. I think I can get my hands on them?) ‘Said the cops had found a body—Mondays paper said they raided the ranch in connection with the unidentified body they found—The paper said the body was found Sat!
 
 The paper said they had an eyewitness who saw from next door a man being
 
 
 *171
 

 murdered in the
 
 garage—Anyway I don’t want to make a novel out of this but I’ve got to clear a few more things up . . . Its hard to figure if someone was telling why they didn’t get me? Everyone knew where I was! It was hard for me to figure
 
 and the only conclusion I can come to now is the one you’ve layed out—got real scared of you and are trying to throw it all on you.
 
 I don’t know why they haven’t booked me??? My prints are all over that! Is this just a little cat & mouse thing with the cops? Hey you make a comment in here ‘Don’t worry Jeff if shit hits the fan I’ll make up some lie & eat it!’ What the fuck does that mean?’ You aint riding a fuckin thing! I told you before & I’ll tell you again this whole fuckin situation is on me! When the time comes I take full responsabity. I will not take anyone with me! Now that I think on it maybe my O.R. plans might have made you feel like you were left holding the bag. I’m sorry if you may have felt that way—but it never entered my mind that you wouldn’t want to go too. As to staying in touch with you . . . put yourself in my shoes and keep in mind there’s only a few weeks between when you got cracked—I think it was twenty days or so . . .1 don’t want to lay a bunch of excuses on you but I did send Wendy up to see you (not on your visiting list.) I brought her up here the next day to see Wok [Padin] and found out he was transfered to Quintín —I had a short letter for you but they don’t have the boxes in the visiting room for mail—now I could have dropped it off with a stamp in mail but keep in mind I’m thinking theirs a murder investigation going full tilt like one’s I’ve seen down south where the cops have pulled out all the stops . . . I’m waiting for every phone called from the ranch to have it door kicked in. I’m their screening all mail that comes to you—I’ve shaved my beard off and, I’m staying with someone that Frankies hooked me up with that doesn’t have to do with anybody associated in that direction—I’m calling your moms from pay phones, (Everytime I have two dollars for the call) and I keep getting the recording— Lisa tells me your moms got rushed after you got cracked and all they took were some letters??
 

 “Its two in the morning right now Brother my finger hurts from pushing this pencil. . . Bottomline their wasn’t a day that went by I didn’t think of you . . . My whole plan was to make a good lump of money to pave the way on getting you out ... It also says in [y]our kite that ‘you have some unfurnished business’ & ‘I’ll take up some lie & eat it. But not before I talk to you & Wok [Padin]!’ So what does that mean?? You wem’t even going to give me the benefit of the doubt? You just throw me in the hat with Wok [Padin]?? Listen Rob if you want my wind you got it! Just tell me how to get over where your at and hold the stake you drive through my heart! I’d kill for you Brother and if you want to accept it or not!
 

 “We should have let money pave the way in our alliance, and then let blood seal it. If you really think I’m that big of a peice of shit after reading
 
 *172
 
 this . . . Then handle it right now because, your friendship means more to me than life itself . . . It’s all I’ve got left—
 

 “As Always HQ L & R s [Ü Jeffrey B.”
 

 Vandevort testified that “going fishing” indicated to him that Bryden was checking on the body, since Vandevort and Bryden had set up fishing poles when they buried Friberg. Also, Vandevort understood the phrase, “only we knew where to go,” as relating to Bryden and Vandevort’s exclusive knowledge of the location of the grave.
 

 On December 11, 1993, police excavated Friberg’s corpse. The police also searched the garage at the ranch and discovered blood splatters on the floor, workbench legs, sewing machine, walls, plastic containers, chairs, lawn equipment, and air compressor. The Toyota parked outside the garage contained blood splattering on the rear license plate, back portion of the car under the bumper, and faint traces on the windshield. The blood type could be determined for some of the splatters, and it was consistent with Friberg’s blood type.
 

 The coroner, Dr. Richard Lucas, conducted an autopsy on Friberg on December 13, 1993. He estimated that Friberg had been dead seven to ten days. The cause of death was a stab wound that penetrated Friberg’s heart. He had been stabbed 18 times with 2 different knives. He also had received two blunt force injuries to the head, and he had suffered a shallow cut to the throat, which was insufficient to cause death.
 

 While in custody, Vandevort told another inmate that he was “feeding the D.A. a line” about the case.
 

 Padin testified at both the first and second trials and the prosecutor read the testimony from the first trial into evidence under the judicial admissions exception to the hearsay rule. Padin acknowledged that Vandevort and he planned to rob drug dealers, but he claimed he did not have the courage to tell Vandevort that he no longer wanted to commit crimes. He, however, wanted to help Vandevort and he invited him to assist in fixing his aunt’s ranch.
 

 After Thanksgiving, Padin maintained, he had little contact with the people at the ranch. When he realized Friberg was no longer around, he questioned Vandevort, who responded that Friberg had left. Padin denied stabbing Friberg and said he never saw a body in the garage; he also claimed that he never showed Vandevort and Bryden where to bury Friberg’s body.
 

 
 *173
 
 A number of witnesses testified at the trial in Fadin’s defense, including his girlfriend Orum, Eastridge, a friend named Chris Juhl, and Fadin’s cousin, Steven Leon (Leon), among others. Juhl testified that his brother died on December 3, 1993. Padin had spent three to four hours with Juhl on December 4 and 5, and most of December 6 at the funeral and reception. Another witness testified about observing Kathy and Friberg together on the couch, and opined' that their conduct was inappropriate.
 

 At the end of the trial, the jury found both defendants guilty of second degree murder with use of a deadly weapon. Defendants moved for a new trial, and the court denied the motions. The court found true two prior prison term allegations as to Bryden and two prior serious felony convictions as to Padin. The court then sentenced Bryden to a term of 18 years to life and Padin to a term of 26 years to life.
 

 Defendants filed a timely notice of appeal.
 

 Discussion
 

 I.
 
 Padin’s Appeal
 

 A.
 
 Admitting the Kite Into Evidence Combined With Prosecutorial Misconduct
 

 (la) Bryden’s clandestine communication to Vandevort while in custody was to be admitted into evidence only against Bryden. Padin contends its admission violated his constitutional right to cross-examination because Bryden did not testify, preventing any cross-examination of him on the veracity of the kite. The kite, Padin contends, was used against him in the following manner: First, the kite bolstered Vandevort’s credibility, and Fadin’ s guilt primarily rested upon Vandevort’s testimony. Second, the prosecutor improperly urged the jurors to use the kite against both defendants.
 

 (2) The Sixth Amendment to the United States Constitution, which applies to the states under the Fourteenth Amendment, protects a defendant’s right to cross-examine all witnesses against him or her.
 
 (Davis
 
 v.
 
 Alaska
 
 (1974) 415 U.S. 308, 315-316 [94 S.Ct. 1105, 1109-1110, 39 L.Ed.2d 347];
 
 Bruton
 
 v.
 
 United States
 
 (1968) 391 U.S. 123 [88 S.Ct. 1620, 20 L.Ed.2d 476]
 
 (Bruton)-, Richardson
 
 v.
 
 Marsh
 
 (1987) 481 U.S. 200 [107 S.Ct. 1702, 95 L.Ed.2d 176].) “[T]he Clause envisions HQ ‘a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness,
 
 *174
 
 but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.’ ”
 
 (Ohio
 
 v.
 
 Roberts
 
 (1980) 448 U.S. 56, 63-64 [100 S.Ct. 2531, 2537-2538, 65 L.Ed.2d 597], quoting
 
 Mattox
 
 v.
 
 United States
 
 (1895) 156 U.S. 237, 242-243 [15 S.Ct. 337, 339-340, 39 L.Ed. 409].)
 

 A defendant’s right to cross-examination is violated when a nontestifying codefendant’s confession (or declaration against penal interests) directly implicates the defendant’s participation in the crime and the confession is admitted into evidence.
 
 (Bruton, supra,
 
 391 U.S. 123.) This right is violated even if the jury is instructed to consider the codefendant’s statements only against the codefendant.
 
 (Id.
 
 at pp. 123-124 [88 S.Ct. at pp. 1620-1621].)
 

 Here, the court redacted Bryden’s kite to excise any statements directly implicating Padin. Padin, however, argues that his Sixth Amendment right was still violated because the jury could properly use the kite to support Vandevort’s testimony in determining Bryden’s guilt. Once the jury used the kite to bolster Vandevort’s credibility in the case against Bryden, it would have become impossible to refuse to use Vandevort’s enhanced credibility against Padin.
 

 In determining whether Fadin’s constitutional right to cross-examination was violated, we must first determine whether Bryden’s communication was admissible hearsay against Padin. (See
 
 People
 
 v.
 
 Greenberger
 
 (1997) 58 Cal.App.4th 298 [68 Cal.Rptr.2d 61]
 
 (Greenberger).)
 
 “[T]he Supreme Court has recognized that there are competing interests that justify dispensing with confrontation at trial in certain circumstances and permitting the introduction of hearsay evidence.”
 
 (Id.
 
 at p. 326.) (3) Hearsay evidence does not violate the Sixth Amendment when the declarant is unavailable and the hearsay had adequate indicia of reliability to justify dispensing with the requirement of confrontation.
 
 (Id.
 
 at pp. 326-327, citing
 
 Ohio
 
 v.
 
 Roberts, supra,
 
 448 U.S. atp. 66 [100 S.Ct. atp. 2539].) “ ‘The Court has applied this “indicia of reliability” requirement principally by concluding that certain hearsay exceptions rest upon such solid foundations that admission of virtually any evidence within them comports with the “substance of the constitutional protection.” . . . ft[] . . . Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.’ [Citation.]”
 
 (Greenberger, supra, atp.
 
 327.) “ ‘[I]f the declarant’s truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility, then the hearsay rule does not bar admission of the
 
 *175
 
 statement at trial.’ [Citation.]”
 
 (Ibid.,
 
 citing
 
 Idaho
 
 v.
 
 Wright
 
 (1990) 497 U.S. 805, 820 [110 S.Ct. 3139, 3149, 111 L.Ed.2d 638].)
 

 Bryden was clearly an unavailable declarant, and, as in
 
 Greenberger,
 
 the only applicable hearsay exception was declaration against penal interests (Evid. Code, § 1230). The
 
 Greenberger
 
 court did not resolve whether a declaration against penal interests is a “firmly rooted hearsay exception” but it did hold that this extrajudicial statement is admissible when the court determines it satisfies the constitutional requirement of trustworthiness.
 
 (Greenberger, supra,
 
 58 Cal.App.4th at pp. 327, 330-334.)
 

 Some courts have set forth the further limitation that a “trustworthy” declaration cannot be admitted if it “ ‘goes to the heart of the case, if it is “crucial” or “devastating” to the defendant[.]’ [Citations.]”
 
 (Greenberger, supra,
 
 58 Cal.App.4th at p. 330, citing
 
 People
 
 v.
 
 Coble
 
 (1976) 65 Cal.App.3d 187, 195 [135 Cal.Rptr. 199];
 
 People
 
 v.
 
 Bullard
 
 (1977) 75 Cal.App.3d 764, 771 [142 Cal.Rptr. 473];
 
 People
 
 v.
 
 Claxton
 
 (1982) 129 Cal.App.3d 638, 666 [181 Cal.Rptr. 281];
 
 People
 
 v.
 
 Frutos
 
 (1984) 158 Cal.App.3d 979, 986 [205 Cal.Rptr. 204];
 
 People
 
 v.
 
 Rios
 
 (1985) 163 Cal.App.3d 852, 867 [210 Cal.Rptr. 271].) Although the
 
 Greenberger
 
 court disapproved of this limitation, we need not consider whether to apply this restriction, since we conclude Bryden’s kite does not satisfy the trustworthiness test.
 

 To determine whether a declaration against interest is trustworthy, the trial court “must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry. [Citations.]”
 
 (Greenberger, supra,
 
 58 Cal.App.4th at p. 334.) Here, Vandevort initiated the correspondence, but his letters, which may have induced Bryden to make the incriminating statements, are not in the record. The kite seems to suggest that Bryden very much wanted to please Vandevort and prove his loyalty; thus, the statements may have been embellished or distorted by a motivation to please Vandevort. Furthermore, much of the communication is not directly against Bryden’s penal interests, and only can be interpreted as being against his interests to the extent it is linked to Vandevort’s testimony. Thus, the kite does not have the sufficient indicia of reliability to defeat Fadin’s Sixth Amendment interests.
 

 We next must consider whether the statements as redacted directly implicated Padin. In
 
 Richardson
 
 v.
 
 Marsh, supra,
 
 481 U.S. at pages 208-211 [107 S.Ct. at pages 1707-1709], the United States Supreme Court held that a confession did not violate the codefendant’s Sixth Amendment rights, because it had to be connected to other evidence to incriminate the defendant.
 
 *176
 
 “Where the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence.” (481 U.S. at p. 208 [107 S.Ct. at p. 1708].)
 

 Simply excising the name of the defendant from the extrajudicial statements is insufficient when it remains obvious that the substituted words refer to the defendant.
 
 (Gray
 
 v.
 
 Maryland
 
 (1998)_U.S._, [118 S.Ct. 1151, 1153, 140 L.Ed.2d 294]
 
 (Gray); People
 
 v.
 
 Fletcher
 
 (1996) 13 Cal.4th 451, 468 [53 Cal.Rptr.2d 572, 917 P.2d 187]
 
 (Fletcher).)
 
 When the statements directly bear on the defendant’s guilt and it is obvious the statements refer to the defendant, the redactions fail to safeguard the defendant’s Sixth Amendment rights. Here, the court redacted Fadin’ s name and all statements which directly implicated him. Therefore the redacted statements did not create the type of problem addressed in
 
 Gray
 
 and
 
 Fletcher.
 

 The only potential impact of Bryden’s kite on the case against Padin was indirect; the jury had to use inference to connect statements in this redacted kite with Padin (see
 
 Gray, supra,
 
 _U.S. at pp._-_ [118 S.Ct. at pp. 1156-1158]). Padin argues that the kite bolstered Vandevort’s testimony, and Vandevort’s testimony was the principal evidence against him. All evidence, however, has the potential of bolstering or undermining a witness’s credibility. Thus, Fadin’s argument would essentially prohibit all joint trials, which would contravene California’s preference for joint trials (Pen. Code, § 1098 [“When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court orders separate trials. . . .”]; see also Cal. Const., art. I, § 30, subd. (a) [“This Constitution shall not be construed by the courts to prohibit the joining of criminal cases as prescribed by the Legislature or by the people through the initiative process.”]). It also disregards the United States Supreme Court’s holding in
 
 Richardson
 
 v.
 
 Marsh, supra,
 
 481 U.S. at pp. 208-211 [107 S.Ct. at pp. 1707-1709], and reaffirmed in
 
 Gray, supra,
 
 _ U.S. at pp._-_[118 S.Ct. at pp. 1154-1158], which concluded no Sixth Amendment right is invoked when other evidence must be associated with the extrajudicial statement to implicate the defendant.
 

 Padin argues that the presumption that the jurors would obey instructions and not use the kite against Padin was nullified because the prosecutor urged the jury to use Bryden’s statements against Padin. (See
 
 Richardson
 
 v.
 
 Marsh, supra,
 
 481 U.S. atpp. 208-211 [107 S.Ct. atpp. 1707-1709];
 
 Fletcher, supra,
 
 13 Cal.4th 451;
 
 U.S.
 
 v.
 
 Sherlock
 
 (9th Cir. 1989) 962 F.2d 1349, 1362
 
 (Sherlock); Hardnett
 
 v.
 
 Marshall
 
 (9th Cir. 1994) 25 F.3d 875.) Compounding tire problem, he asserts, was the court’s failure in its general limiting instruction to refer specifically to the kite and admonish the jury not to use it when assessing Vandevort’s credibility.
 

 
 *177
 
 This error, Padin maintains, was not harmless beyond a reasonable doubt
 
 (Harrington
 
 v.
 
 California
 
 (1969) 395 U.S. 250, 251 [89 S.Ct. 1726, 1727, 23 L.Ed.2d 284]). The prosecutor described the kite as the “meat and potatoes” of her case. Further, he asserts that the physical evidence was inconclusive on the crucial issue of identity; only Vandevort’s testimony established identity. Because of Vandevort’s criminal history and the possibility that he was the actual murderer, he was a particularly unreliable and untrustworthy witness. The closeness of the case and the significance of the kite were highlighted by the first jury’s rejection of Vandevort’s testimony when it voted nine to three for acquittal in a trial which did not include the admission of the kite into evidence.
 

 As Padin contends, the effect of a limiting instruction may be undone when the prosecutor urges the jury to use the codefendant’s statements to evaluate the defendant’s case.
 
 (Richardson
 
 v.
 
 Marsh, supra,
 
 481 U.S. at p. 211 [107 S.Ct. at p. 1709].) However, the
 
 Marsh
 
 court does not hold that such prosecutorial misconduct creates a constitutional error as Padin implicitly argues. Rather, the
 
 Marsh
 
 court concluded the defendant’s Sixth Amendment right in the case before it had not been violated because the codefendant’s confession did not directly implicate the defendant, but the court remanded the case for the lower court to consider “whether, in light of respondent’s failure to object to the prosecutor’s comments, the error can serve as the basis for granting a writ of habeas corpus.” (481 U.S. at p. 211 [107 S.Ct. at p. 1709].) When the statements after redaction do not directly implicate the defendant, but the prosecution improperly uses these statements against the codefendant, we look to see whether the trial court abused its discretion in refusing to sever the trial and in refusing to grant a mistrial
 
 (Sherlock, supra,
 
 962 F.2d at pp. 1359-1360;
 
 People
 
 v.
 
 Cruz
 
 (1988) 121 Ill.2d 321, 334 [117 Ill.Dec. 907, 521 N.E.2d 18, 24]).
 

 The People argue any objections were waived
 
 (People
 
 v.
 
 Mitcham
 
 (1992) 1 Cal.4th 1027, 1050 [5 Cal.Rptr.2d 230, 824 P.2d 1277]), because of Fadin’s failure to present the claim of prosecutorial misconduct in a timely fashion
 
 (People
 
 v.
 
 Johnson
 
 (1992) 3 Cal.4th 1183 [14 Cal.Rptr.2d 702, 842 P.2d 1]). Further, when Fadin’s counsel did object, the trial court cautioned the jury to recall the instructions on that subject matter. If Padin did not consider the warning sufficient, he could have asked for a different one. (See
 
 People
 
 v.
 
 Williams
 
 (1988) 44 Cal.3d 883, 967 [245 Cal.Rptr. 336, 751 P.2d 395];
 
 People
 
 v.
 
 Fosselman
 
 (1983) 33 Cal.3d 572, 580-583 [189 Cal.Rptr. 855, 659 P.2d 1144].)
 

 Padin responds that the objections were timely and sufficient and, if not, he argues in his habeas corpus petition that he received ineffective assistance of trial counsel.
 

 
 *178
 
 The prosecutor made the following references to the kite in closing argument: “Again, [Padin] knows he’s in trouble. He has to explain that phone call and that kite because that is devastating to him. And that’s not Robbie Vandevort talking and that’s not Kat [Kathy] talking, that’s these two gentlemen on the phone. . . .” As the prosecutor displayed a chart which detailed the duped telephone conversation, the kite, Vandevort’s testimony, and the facts of the case, she commented: “Now let’s get to the meat and potatoes . . . . fl[] What I’m handing out to you is devastating material. And when I say devastating material, I mean to both Mr. Padin and Mr. Bryden . . . .”
 

 Later, during closing argument, the prosecutor commented: “That’s what this kite is about. This kite is very important. This kite is very important because it tells you that these then were stone, cold killers. ... [U] ... [H] That is why I asked those questions. It confirms that kite.” At this point, Fadin’s counsel objected, and the court stated that it had properly instructed the jury that the kite was inadmissible against Padin. Finally, the prosecutor stated: “The kite, the phone call, contrary to what Mr. Markowitz wants you to believe, that says it all. That says it all.”
 

 Defense counsel objected again and the court cautioned the jury: “But I think you well understand there are two separate trials here. And each defendant is entitled to have the evidence applicable to each defendant independently, applied to each defendant. fl[] And the mere fact that you apply evidence as to one defendant does not mean that you’re going to be able to apply that to the second defendant. . . .”
 

 In addition to the above reminder, the court provided the jury with the following general limiting instruction: “Evidence has been admitted against one of the defendants and not admitted against the other. [^] At the time this evidence was admitted, you were admonished that it could not be considered by you against the other defendant. [50 Do not consider such evidence against the other defendant. [1Q Evidence has been received of a statement made by a defendant after his arrest, [f] At the time the evidence of this statement was received, you were told that it could not be,considered by you against the other defendant, ffl] Do not consider the evidence of such statement against the other defendant. [1j] Certain evidence was admitted for a limited purpose. ft[] At the time this evidence was admitted, you were admonished that it could not be considered by you for any purpose other than the limited purpose for which it was admitted. [5Q Do not consider such evidence for any purpose except the limited purpose for which it was admitted. ...”
 

 During deliberations the jurors asked whether the kite was evidence against Padin. The court provided the jury with the following note: “In
 
 *179
 
 response to your most recent note, the so-called ‘kite’, Exhibits No[s]. 155, 155B, 155C, was admitted into evidence only as being applicable to Mr. Bryden. It is not in evidence as against Mr. Padin.”
 

 Padin argues that these instructions failed to advise the jury not to use the kite to determine Vandevort’s credibility in the case against Padin. However, as discussed
 
 ante,
 
 evidence will generally tend to bolster or weaken a witness’s credibility; thus, a rule which barred extrajudicial statements of a codefendant based on the possibility they may enhance a witness’s credibility would effectively eliminate all trials of codefendants. Furthermore, Vandevort’s credibility was substantiated by other evidence. The duped conversation, the coroner’s testimony establishing that two different knives were used to kill Friberg, and the evidence of Friberg’s blood in the garage at the ranch also enhanced Vandevort’s credibility.
 

 Since (1) the kite did not directly implicate Padin, (2) Vandevort’s testimony was corroborated by evidence other than the kite, and (3) the court specifically instructed the jurors not to consider the kite as evidence against Padin, we conclude that the prosecutor’s misuse of the kite during closing argument did not invalidate the effect of the limiting instructions. Thus, any error was harmless under
 
 People
 
 v.
 
 Watson
 
 (1956) 46 Cal.2d 818, 836 [299 P.2d 243], and the court did not abuse its discretion in refusing to sever and in denying the motion for a mistrial.
 

 In his habeas corpus petition, Padin also contends that his trial counsel provided ineffective assistance for failing to request an instruction which limited the jury’s consideration of Bryden’s extrajudicial statement and for failing to object when the prosecutor indirectly used the kite against Padin. To establish ineffective assistance, a defendant must show the representation fell below an objective standard of reasonableness under prevailing professional norms and a reasonable probability existed but for counsel’s failings, defendant would have received a more favorable result.
 
 (People
 
 v.
 
 Pope
 
 (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1];
 
 Strickland
 
 v.
 
 Washington
 
 (1984) 466 U.S. 668, 694 [104 S.Ct. 2052, 2068, 80 L.Ed.2d 674].) “A reasonable probability is a probability sufficient to undermine confidence in the outcome.”
 
 (Strickland
 
 v.
 
 Washington, supra,
 
 at p. 694 [104 S.Ct. at p. 2068].) “[W]here the record shows that counsel’s omissions resulted from an informed tactical choice within the range of reasonable competence, the. conviction must be affirmed.”
 
 [People
 
 v.
 
 Pope, supra,
 
 at p. 425.) “In some cases, however, the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged. In such circumstances, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, these cases are affirmed on appeal.”
 
 (Id.
 
 at p. 426, fn. omitted.)
 

 
 *180
 
 For the reasons set forth above, we have concluded that the instructions given were sufficient, and any use of the kite was not prejudicial. Thus, even if the failure to object cannot be supported by any tactical, reason, a reasonable probability does not exist that the outcome would have been different had an additional instruction been given or the prosecutor not made the improper remarks.
 

 B.
 
 Admitting Evidence of an Uncharged Murder Involving a Decapitated Body
 

 Padin contends that the court abused its discretion in admitting evidence of a defense witness’s alleged involvement in another murder involving a decapitation. In reviewing the trial court’s decision, the appropriate standard of review is abuse of discretion.
 
 (People
 
 v.
 
 Gordon
 
 (1990) 50 Cal.3d 1223, 1239 [270 Cal.Rptr. 451, 792 P.2d 251].)
 

 While cross-examining defense witness Orum, the prosecutor asked her whether she remembered a murder in September 1993 involving a headless body, and whether the police had interviewed her regarding this murder. Fadin’s counsel objected that a “collateral investigation of another case” had “nothing to do with this case.” The prosecutor responded that the evidence was releyant to bolster Kathy’s credibility, because Kathy was going to testify about having this conversation with Orum. The court overruled Fadin’s objection.
 

 The prosecutor inquired whether the police had questioned Orum regarding her possible involvement in cleaning up after the headless murder. Orum admitted to being questioned by the police, but denied any involvement in the murder. The prosecutor then questioned Orum about asking. Kathy whether she had “ever seen what a pig could do to a head?” and Orum claimed she never posed such a question.
 

 The prosecutor asked whether Orum was aware of the sergeant’s opinion of her reputation, and defense counsel objected. The court sustained the objection, but the prosecutor inquired, “Do you have any personal knowledge that you’re known as a merry murder maiden?” Defense counsel objected again and, in argument outside of the presence of the jury, Fadin’s trial counsel mentioned Evidence Code section 1101 for the first time. The court sustained the objection.
 

 Padin argues the questions and statements regarding the headless murder were inadmissible pursuant to Evidence Code section 1101. Evidence Code section 1101, subdivisions (a) and (b) provide: “(a) Except as provided in
 
 *181
 
 this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person’s character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. ftQ (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act.”
 

 Padin’s general objection to the evidence, he argues, was sufficient to preserve the issue on appeal
 
 (People
 
 v.
 
 Williams, supra,
 
 44 Cal.3d at pp. 906-907), and if not, he contends that his counsel’s failure to object in a timely fashion constituted ineffective assistance of trial counsel.
 

 The prosecutor argued the evidence should be admitted to bolster Kathy’s credibility. Credibility, Padin argues, is not a proper basis for permitting questions and evidence about an uncharged murder. “As a general rule, the courts have interpreted Evidence Code section 1101 as not permitting introduction of uncharged prior acts solely to corroborate or bolster the credibility of a witness. [Citations.]”
 
 (People
 
 v.
 
 Brown
 
 (1993) 17 Cal.App.4th 1389, 1396-1397 [22 Cal.Rptr.2d 14], italics omitted.)
 

 Admitting this evidence, Padin asserts, resulted in prejudice. The prosecution argued that Orum aided Padin by cleaning up the murder scene. Thus, testimony concerning cleanups after other murders, Padin claims, would tend to confirm she cleaned up after this murder. Evidence of other crimes has a highly inflammatory and prejudicial effect.
 
 (People
 
 v.
 
 Thompson
 
 (1980) 27 Cal.3d 303, 314 [165 Cal.Rptr. 289, 611 P.2d 883].) The effect was heightened, Padin maintains, because this was the last evidence the jury heard and the evidence involved a murder, which was the charge against Padin. Since this was a very close case, and the previous jury voted nine to three for acquittal, Padin argues a reasonable probability existed that he would not have been convicted had the evidence been excluded.
 

 We conclude that, even assuming Padin did not waive any objection on the grounds of Evidence Code section 1101, no abuse of discretion is demonstrated here
 
 (People
 
 v.
 
 Mayfield
 
 (1997) 14 Cal.4th 668, 748 [60 Cal.Rptr.2d 1, 928 P.2d 485]). As the People contend, no testimony was elicited and no implication was made that either Padin or Bryden was a participant in the prior murder. The evidence was admitted only to impeach Orum and to bolster the contrary testimony of Kathy.
 

 
 *182
 
 Further, we conclude that any error in admitting the testimony was harmless. The evidence did not implicate a defendant, but merely a witness. Fadin’s argument that his close relationship with Orum would cause the jurors to connect the headless murder to him is far too tenuous. Moreover, Orum denied any involvement in the headless murder. Given the testimony of Vandevort, and the physical evidence of Friberg’s blood in the garage, it is not reasonably probable that Padin would have received a better result if the evidence had not been admitted (see
 
 People
 
 v.
 
 Escobar
 
 (1996) 48 Cal.App.4th 999, 1025 [55 Cal.Rptr.2d 883]).
 

 C.
 
 Other Acts of Prosecutorial Misconduct
 

 In addition to using the kite improperly, Padin argues the prosecutor engaged in three other acts of misconduct which prejudiced his trial. Prosecutors play a dual role in the criminal justice system; they are advocates, but they are also administrators of justice.
 
 (United States
 
 v.
 
 Young
 
 (1985) 470 U.S. 1, 9, fn. 7 [105 S.Ct. 1038, 1043, 84 L.Ed.2d 1].) “ ‘[I]t is their sworn duty to see that the defendant has a fair and impartial trial, and that he be not convicted except by competent and legitimate evidence. . . .’”
 
 (People
 
 v.
 
 McCracken
 
 (1952) 39 Cal.2d 336, 349 [246 P.2d 913].) Padin contends that the prosecutor here failed to adhere to these principles.
 

 “Preliminarily, we note that a claim of prosecution misconduct must be assessed in light of [the following] .... ‘Misconduct of the prosecuting attorney may not be assigned as error on appeal if it has not been assigned at the trial unless, the case being closely balanced and presenting grave doubt of the defendant’s guilt, the misconduct contributed materially to the verdict or unless the harmful results of the misconduct could not have been obviated by a timely admonition to the jury. [Citations.] Subject to the foregoing two exceptions, it is the general rule that error predicated on the alleged misconduct of the prosecutor cannot be raised on appeal in the absence of (a) an assignment of such misconduct as error and (b) a request to the trial court to instruct the jury to disregard it. A mere objection to the allegedly prejudicial statements without a request to the court to instruct the jury to disregard them is ordinarily insufficient to raise the question of misconduct on appeal. [Citations.] “Whether a prosecutor has been guilty of prejudicial misconduct must be determined in the light of the particular factual situation involved.” [Citations.]’ [f] . . . [ftj Finally, ... the judgment will not be reversed unless, after a review of the entire cause, it appears that it is ‘reasonably probable’ that a result more favorable to the defendant would have occurred had the district attorney refrained from the misconduct in question
 
 *183
 
 [citations]. If it is asserted that the alleged misconduct is of constitutional dimensions, it need only be clear ‘beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained’ [citation].”
 
 (People
 
 v.
 
 Meneley
 
 (1972) 29 Cal.App.3d 41, 58-59 [105 Cal.Rptr. 432], overruled on the issue that a finding of bad faith is required to find misconduct in
 
 People
 
 v.
 
 Bolton
 
 (1979) 23 Cal.3d 208, 213-214 [152 Cal.Rptr. 141, 589 P.2d 396].)
 

 We examine the alleged acts of prosecutorial misconduct in light of the above criteria:
 

 (1) Padin argues that the improper questioning of Orum'regarding her reputation as a “merry murder maiden” after the court had sustained the objection to such an inquiry constituted prosecutorial misconduct. As already discussed
 
 ante,
 
 Padin’s counsel did not properly object to this questioning. Moreover, even if we presume the objection was preserved, such misconduct was harmless since, as discussed
 
 ante,
 
 it is not reasonably probable that a different verdict would have resulted if the question regarding the “merry murder maiden” had not been made.
 

 (2) A second improper line of examination, according to Padin, involved questioning Leon and Eastridge about their arrests and misdemeanor convictions
 
 (People
 
 v.
 
 Wheeler
 
 (1992) 4 Cal.4th 284, 295 [14 Cal.Rptr.2d 418, 841 P.2d 938] [no impeachment with misdemeanor convictions];
 
 People
 
 v.
 
 Medina
 
 (1995) 11 Cal.4th 694, 760 [47 Cal.Rptr .2d 165, 906 P.2d 2];
 
 People
 
 v.
 
 Anderson
 
 (1978) 20 Cal.3d 647, 650 [143 Cal.Rptr. 883, 574 P.2d 1235] [“evidence of . . . prior arrests is inadmissible”]; see also
 
 People
 
 v.
 
 Castro
 
 (1985) 38 Cal.3d 301, 317 [211 Cal.Rptr. 719, 696 P.2d 111] [misdemeanors are proper for impeachment only when they involve moral turpitude];
 
 People
 
 v.
 
 Littrel
 
 (1986) 185 Cal.App.3d 699, 703 [230 Cal.Rptr. 83]). The prosecutor asked Leon if he had been arrested or convicted of having loaded firearms in public or in a vehicle. Additionally, the prosecutor asked Eastridge whether she had been arrested several times for possession of hypodermic needles, and whether she had pleaded guilty to assault with a deadly weapon when charged with attempted murder.
 

 Defense counsel objected to this questioning, which the court sustained, but Padin asserts that the prosecutor was still able to bring before the jury inadmissible, prejudicial information (see
 
 People
 
 v.
 
 Anderson, supra,
 
 20 Cal.3d at p. 651 [“[A] witness’ credibility in the eyes of the jury would be seriously impaired by evidence of prior criminal arrests, because of the ‘bad character’ inevitably suggested thereby.”]).
 

 
 *184
 
 We conclude that, even presuming this questioning constituted misconduct, the prosecutor’s conduct did not prejudice Padin. As the People contend, Leon and Eastridge were not critical witnesses for the defense and this case did not involve the possession or use of firearms or the possession of hypodermic needles. Merely posing a question regarding these acts did not affect the outcome of this case. Further, the court instructed the jury that questions and statements by the attorneys do not constitute evidence, and the jury is presumed to follow the court’s instructions (see
 
 People
 
 v.
 
 Ryan
 
 (1981) 116 Cal.App.3d 168, 179 [171 Cal.Rptr. 854]).
 

 (3) Finally, Padin argues that the prosecutor improperly emphasized a key piece of the prosecutor’s case, the kite, during closing argument. The prosecutor mentioned the kite during her opening statement and the kite was admitted into evidence, but she waited until closing argument to present her chart which compared the evidence of the kite, the duped phone call, the facts of the case, and Vandevort’s testimony. Padin argues that the Supreme Court has “long criticized the prosecution’s use of a crucial witness on rebuttal when the witness was available and known to the prosecution during the prosecution’s case in chief.”
 
 (People
 
 v.
 
 Mosher
 
 (1969) 1 Cal.3d 379, 399 [82 Cal.Rptr. 379, 461 P.2d 659]; see also
 
 People
 
 v.
 
 Hill
 
 (1967) 66 Cal.2d 536, 565 [58 Cal.Rptr. 340, 426 P.2d 908];
 
 People
 
 v.
 
 Robinson
 
 (1995) 31 Cal.App.4th 494, 505 [37 Cal.Rptr.2d 183];
 
 People
 
 v.
 
 Carter
 
 (1957) 48 Cal.2d 737, 753 [312 P.2d 665];
 
 People
 
 v.
 
 Mayfield, supra,
 
 14 Cal.4th at p. 761.)
 

 Padin acknowledges that his counsel did not object to this rebuttal argument; thus, any argument of prosecutorial misconduct is waived. In his petition for habeas corpus relief, Padin contends his trial counsel’s failure to object constituted ineffective assistance. As Padin concedes, no authority directly prohibits the prosecutor’s actions, and the prosecutor did not refer to matters outside the record. (10) Rebuttal argument must permit the prosecutor to fairly respond to arguments by defense counsel (see
 
 People
 
 v.
 
 McDaniel
 
 (1976) 16 Cal.3d 156, 177 [127 Cal.Rptr. 467, 545 P.2d 843]), and the prosecutor did that here. Further, as the People note, the prosecutor mentioned the kite and all the evidence in opening argument even if she waited to discuss the kite more fully in her closing argument Therefore no unfair surprise can be established on this record. Since no authority expressly prohibits the prosecutor’s conduct, we conclude defense counsel did not act unreasonably by failing to object to the closing argúment.
 

 Additionally, Padin cannot establish any prejudice. The kite was admitted into evidence only against Bryden, and as discussed
 
 ante,
 
 any reference to
 
 *185
 
 Padin was not prejudicial. Moreover, defense counsel had a full and fair opportunity to argue to the jury.
 

 We conclude that if any prosecutorial misconduct occurred, it was not prejudicial.
 

 D.
 
 Admitting Photographs of Friberg’s Body Into Evidence
 

 Padin objected to the blowups of the photographs of Friberg’s body on the grounds that they were unduly prejudicial. The blowups included pictures of Friberg’s bloated decomposing head and bloated decomposing body.
 

 In reviewing the trial court’s decision, we consider “(1) whether the challenged evidence satisfied the ‘relevancy’ requirement set forth in Evidence Code section 210, and (2) if the evidence was relevant, whether the trial court abused its discretion under Evidence Code section 352 in finding that the probative value of the photograph was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice.”
 
 (People
 
 v.
 
 Scheid
 
 (1997) 16 Cal.4th 1, 13 [65 Cal.Rptr.2d 348, 939 P.2d 748].)
 

 Evidence Code section 210 defines relevant evidence as evidence “having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.” (13) The test of relevance is whether the evidence tends “ ‘logically, naturally, and by reasonable inference’ to establish material facts such as identity, intent, or motive. [Citations.]”
 
 (People
 
 v.
 
 Garceau
 
 (1993) 6 Cal.4th 140,
 
 111
 
 [24 Cal.Rptr.2d 664, 862 P.2d 664].) The trial court has broad discretion in determining the relevance of evidence
 
 (ibid.),
 
 but lacks discretion to admit irrelevant evidence
 
 (People
 
 v.
 
 Crittenden
 
 (1994) 9 Cal.4th 83, 132 [36 Cal.Rptr.2d 474, 885 P.2d 887]).
 

 Padin contends that the photographs were not relevant because they merely demonstrated the decomposition of Friberg’s body, which was an undisputed issue and merely “cumulative of expert . . . testimony” on this issue
 
 (People
 
 v.
 
 Anderson
 
 (1987) 43 Cal.3d 1104, 1137 [240 Cal.Rptr. 585, 742 P.2d 1306]). The coroner’s testimony also provided evidence of the state of the body.
 

 The People contend the photographs were relevant to establish identity and intent. The chest and head wounds corroborated Vandevort’s testimony
 
 *186
 
 regarding the use of two knives at different times by defendants. The bolstering of the prosecution witness’s credibility justifies the admission of the photographs (see
 
 People
 
 v.
 
 Scheid, supra,
 
 16 Cal.4th at p. 15;
 
 In re Romeo C.
 
 (1995) 33 Cal.App.4th 1838, 1843 [40 Cal.Rptr.2d 85] [“Evidence may be relevant even though it is cumulative; thus, the only ban on cumulative evidence is found in Evidence Code section 352.”]). Additionally, the coroner referred to the photographs during his testimony, and the photographs need not be excluded as cumulative where, as here, they are offered to prove facts established by testimony.
 
 (People
 
 v.
 
 Scheid, supra,
 
 16 Cal.4th at p. 14.)
 

 The record establishes that the court did assess the photographs under Evidence Code section 352. The court acknowledged the photographs were “not very pleasant” and some were “close to the edge,” and it excluded some while admitting others. The trial court concluded: “Well, the record should clearly reflect that I’ve examined these photographs very carefully. And I’m satisfied that some of them are easily admitted and there’s some that are close to the edge.” The record thus discloses that the trial court “understood and fulfilled its responsibilities under Evidence Code section 352. Nothing more was required.”
 
 {People
 
 v.
 
 Garceau, supra, 6
 
 Cal.4th at p. 182.)
 

 Padin asserts that “no useful and proper purpose [is] served by emphasizing to the jury, by repeated testimonial and photographic description, the horrible condition . . .”
 
 (People
 
 v.
 
 Cavanaugh
 
 (1955) 44 Cal.2d 252, 268 [282 P.2d 53]) of the body because of its state of decomposition. (See also
 
 People
 
 v.
 
 Smith
 
 (1973) 33 Cal.App.3d 51 [108 Cal.Rptr. 698] [only function of photographs was to appeal to jury’s emotions].) The People respond that the photographs were unpleasant but not excessively gruesome. “ ‘[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant....’”
 
 (People
 
 v.
 
 Pierce
 
 (1979) 24 Cal.3d 199, 211 [155 Cal.Rptr. 657, 595 P.2d 91].)
 

 Finally, we conclude that any error was harmless.
 
 {People
 
 v.
 
 Watson, supra,
 
 46 Cal.2d at p. 836.) The photographs were no more inflammatory than the graphic testimony by the coroner. (See
 
 People
 
 v.
 
 Scheid, supra,
 
 16 Cal.4th at p. 21.) Further, given Vandevort’s testimony, the coroner’s testimony, and the evidence of Friberg’s blood in the garage, it is not reasonably probable that the exclusion of the photographs would have resulted in a different verdict.
 

 II.
 
 Bryden’s Appeal
 

 *
 

 
 *187
 
 Disposition
 

 We affirm the judgment regarding both defendants, and deny Fadin’s petition for habeas corpus relief.
 

 Kline, P. J., and Haerle, J., concurred.
 

 A petition for a rehearing was denied May 14, 1998, and appellants’ petitions for review by the Supreme Court were denied August 12, 1998.
 

 [1]
 

 All quoted references to the “kite” throughout the opinion are as they appear in the original document—misspellings, grammar, and punctuation have not been corrected. The text in brackets has been added.
 

 *
 

 See footnote,
 
 ante,
 
 page 159.